McINTYRE v. JOSEPH E. SEAGRAM &
SONS CO., Inc.

No. 926.

District Court, W. D. Kentucky,
at Louisville.

July 17, 1947.

J. Paul Keith, Jr., Jones, Keith & Jones
and Cohen & Fisher, all of Louisville,
Ky., for complainant.

T. M. Galphin, Jr., of Louisville, Ky.,
for defendant.

SHELBOURNE, District Judge.

This action filed June 8, 1945 by W. C.
McIntyre, suing "for himself and 84 fel-
low employees similarly situated," against
Joseph E. Seagram & Sons Co., seeks, as
to complainant, judgment in the sum of
$1,355.10 for unpaid wages and a like
amount as liquidated damages and a rea-
sonable attorney's fee. For the 84 fellow
employees, for whose benefit he sued,
recovery was sought for the amount owed
them with similar amount as liquidated
damages and attorney's fees.

In substance, the complaint alleged that
McIntyre was employed by defendant from
June 13, 1941, to August 1, 1944, as a
machinist in the maintenance department
and that during that period the defendant
was engaged in the production of industrial
alcohol and complainant and the 84 fel-
low employees "were engaged in com-
merce within the meaning of the Fair
Labor Standards Act of 1938." No ref-
erence was made as to the period of time
employed or the nature of the duties
performed by any of the 84 fellow em-
ployees. As to McIntyre, the complaint
is thus stated:

"Complainant states that he was required
to go in the gate of defendant's premises
and be checked in at the south gate by a
guard each and every day of his employ-
ment; that he was then required to go to
the clock located some distance from the
gate, which required 2½ minutes; upon
punching the clock he was required to go
to his locker-room to obtain his soiled
uniform, go from the locker-room to the
stock-room and exchange said uniform for

a clean uniform, then return to the building where the locker-room was, change from his street clothes to his uniform, then go to another building where he checked in with his foreman and began his work; that he worked 8 hours at his job, then he was required to return to the locker-room, change his clothes, go back to the clock where he punched out, then back to the south gate where he was checked out by a guard; that it did regularly require 10 minutes from the time he punched in on his clock until he reported to his foreman for duty, 10 minutes from the time he left his work until he punched out on his clock, 2½ minutes from then until he was checked out at the gate by the guard, requiring a total of 45 minutes from then until he was checked out at the gate by the guard, requiring a total of 45 minutes each and every day six days per week; that he was not paid for the 45 minutes each day above set out, and that by reason thereof defendant is indebted to him in the sum of $1355.10 as shown below:

at the regular quitting time, and that the total time during each of the 797 days amounts to 33 minutes, each and every day, which said 33 minutes includes the time spent in walking from the gate to the time-clock at the beginning of the day, and the time spent walking from the time-clock to the gate at the close of the day."

The answer of the defendant questioned in its first defense the sufficiency of the complaint to state a claim upon which relief could be granted as to McIntyre and in its second defense raised the same question as to the 84 fellow employees for whose benefit McIntyre sued.

Defendant admitted the allegation that it required 2½ minutes to enter the outer or South gate, be recognized by the guard and to walk thence to the time clock. It alleged that until McIntyre appeared at the place of work assignment and after his work schedule period ended, defendant had no supervision, control or direction of his activities and that if, walking to the clock, punching in and out at the clock and changing clothes did constitute work,

| Period | No. of Wks. | Rate per hr. | Hrs Overtime | Amt Due |
|---|---|---|---|---|
| 6/13/41 to 8/1/41 | 7 | $1.10 | 31½ | $52.01 |
| 11/15/41 | 15 | 1.15 | 67½ | 116.44 |
| 6/19/42 | 31 | 1.20 | 139½ | 251.10 |
| 8/1/41 | 110 | 1.26 | 495 | 935.55 |
| | | | | $1355.10" |

The case was tried to the Court without a jury on June 26, 1946. At the outset of the trial there was filed an amended complaint which is as follows:

"Complainant for amendment to his original complaint and in order to conform to the proof states that the time customarily and ordinarily required by him during the 797 days he was employed by the defendant company from the time he punched in on said clock in the morning until he reported to his foreman for duty was 28 minutes; that all of said time was used as set out in the original complaint, and no part of said time was used for his personal convenience, and that he regularly and customarily quit his regular duties from 5 to 10 minutes before quitting time so that he punched out on said time-clock

one of two alternatives was true, i. e. (a) plaintiff was allowed more than sufficient time without any decrease in his compensation for such activities, or (b) such activities were of such little consequence that they did not constitute compensable time within the meaning of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq.; that McIntyre was not required to punch the clock before the beginning of the work period, but was allowed up to six minutes after the beginning of his work period for that purpose, and was permitted to appear at his work assignment after the beginning of his work period by such time as was necessary to allow him to punch the clock, obtain his uniform, change his clothing and report to his place of work assignment. That near the end of the work period Mc-

Intyre was given such time as was reasonably necessary to leave his work, exchange a soiled uniform for a clean one, go to his locker, remove the coveralls, "wash up," put on his street clothes and punch out at the clock before the end of the work period.

That each day McIntyre made out his own work ticket on which he stated the time spent by him during his work period and that McIntyre had been paid in accordance with the tickets submitted by him and that the work tickets were checked against the time clock both as to punching in and punching out only for the purpose of verifying the worker's presence on the company's premises for the time claimed on his work ticket. That if McIntyre went to his locker room, changed his clothing or reported to the place of his work assignment before the beginning of the work period for which he was paid, he did so voluntarily without being required or authorized so to do by the defendant, but that if he did so the time so employed was not compensable time within the meaning of the Fair Labor Standards Act. That defendant's act in furnishing to its employees a place on its premises for putting on and removing their coveralls was for the benefit of the employees and to save them the necessity of keeping the coveralls at their homes and wearing them to and from work and to save employees clothing in which to work. That the wearing of the coveralls by the employees was the result of a collective bargaining agreement between International Association of Machinists Union, of which McIntyre was a member and an officer, by which agreement the laundry furnished the uniforms, one laundering of which during each week was paid by the employee and the remaining laundering was paid by the company.

A stipulation filed by counsel shows that the eight-hour work periods during which the employees worked varied as to McIntyre. The work periods were 7:30 A.M. to 4:00 P.M., 3:00 P.M. to 11:00 P.M., 11:00 P.M. to 7:00 A.M.; 6:00 A.M. to 2:00 P.M., 8:00 A.M. to 4:30 P.M., 2:00 P.M. to 10:00 P.M., 1:00 P.M. to 9:00 P.M. In the periods from 7:30 A.M. to 4:00 P.M. and 8:00 A.M. to 4:30 P.M., there was included one-half hour lunch period which was not within the working period. With respect to the time clock at which the employees punched in and punched out their arrival at the plant, it was stipulated that the clock registered only six minute intervals, that is, if any employee punched the clock at 7:00 A.M. or at any time between 7:00 A.M. and five minutes and fifty nine seconds after seven o'clock, the clock registered "7.0.," if he punched it at 7:06 A.M. or any time between 7:06 and eleven minutes and fifty nine seconds after seven o'clock, the clock registered "7.1".

At the beginning of the trial plaintiff's counsel entered a motion to dismiss without prejudice as to the 84 fellow employees for whose benefit McIntyre had instituted the suit. This motion was sustained. Therefore, in this action, only the activities of McIntyre are involved. Included in the stipulation is a schedule copied from the time cards on which is set out time at which McIntyre punched in and punched out at the clock on each day he worked during the period involved here. Upon the filing of this stipulation and the amended complaint, it was conceded that McIntyre quit his regular duties from five to ten minutes before quitting time and punched out on the time clock at his regular scheduled quitting time. It will be noted that in the original complaint it was claimed that ten minutes was required from the time he punched in at the time clock until he reported to his foreman for work assignment, but that in the amended complaint it is alleged that twenty-eight minutes elapsed between the time he punched in on the time clock in the morning until he reported to his foreman for his work assignment, and that it was claimed that McIntyre was entitled to recover, for each day he worked, compensation for this twenty-eight minutes and for the two and a half minutes spent in walking from the South gate to the time clock each morning and two and a half minutes from the time clock to the South gate each afternoon.

The issues essentially were:

(1) Whether the plaintiff was required before the beginning of his scheduled work period to punch the clock, go to his locker, obtain his soiled coverall and exchange it for a clean one, change his clothing, and

report for his work assignment by the beginning of the scheduled work period.

(2) Whether time spent in walking from the time clock to the worker's locker and obtaining and changing into coveralls constituted work for which the plaintiff should be compensated or whether this work, if such, was solely for the benefit of the employee or of such an unsubstantial nature as to come within the de minimis rule.

(3) The actual time required to do such pre-work activities.

## Findings of Fact

1. Complainant, W. C. McIntyre, was employed by the defendant as a machinist in the maintenance department at its plant near Louisville in Jefferson County, Kentucky, from June 23, 1941, until September 2, 1944, during all of which time his work consisted in inspecting and repairing machinery at the plant. Complainant's normal weekly work-period consisted of forty hours separated into eight-hour periods on five days a week. The scheduled periods in which he was engaged were as copied above from the stipulation.

2. Defendant operated a distillery and bottling plant and from October, 1942, to August 1944, it was engaged exclusively in making alcohol under contract with the United States Government or an agency thereof, which alcohol was shipped to various places outside the State of Kentucky.

3. McIntyre's rate of compensation during the period of employment was as follows:

June 23, 1941 to August 1, 1941, $42 per 40-hour week, rate per hour $1.05; August 1, 1941, to September 26, 1941, $44 per 40-hour week, rate per hour $1.10; September 26, 1941, to November 14, 1941, $46.20 per 40-hour week, rate per hour $1.155; November 14, 1941, to June 19, 1942, $48.50 per 40-hour week, rate per hour $1.213; June 19, 1942, to September 1, 1944, $50.72 per 40-hour week, rate per hour $1.268.

4. Complainant and the other aforesaid employees entered defendant's premises through a gate, referred to in the evidence as the "South Gate." At this gate there was stationed an employee of defendant, referred to in the testimony as a "guard", whose duty it was to see to it that persons entering or leaving the premises were employees or persons otherwise rightfully on the premises. Each employee was furnished by defendant with an identification badge to be exhibited to the employee at the gate when he entered or left the premises.

5. Neither the complainant nor any of the other employees was required to enter the premises at any fixed or particular time, except that it was necessary for them to punch in at the time clock, hereinafter referred to, by 5 minutes and 59 seconds after the scheduled period began in order to be recorded as being on time for the scheduled period. It would take a person 2½ minutes to enter the gate, be recognized, and walk to the time clock, if he did so directly; likewise, it would take a person 2½ minutes to walk from the clock to the gate, be recognized, and walk out of the premises, if he did so directly.

6. Time cards were arranged in alphabetical order in a rack by the clock. An employee upon going to the clock would reach for his card, place it in the clock, which would instantly record the time, and then the employee would put it back in the rack and walk out. At times there were 10 men in line to punch in ahead of complainant, sometimes 20, sometimes more, and there were also times when there were none ahead of him in line.

7. After punching in at the clock, complainant, whether immediately so or not, would go to a locker, there remove his street clothes and shoes, put on his work clothes and work shoes, and report to his foreman for work assignment.

8. Toward the end of the daily work period, complainant and each of the other employees similarly employed would make out a work ticket for the number of hours claimed by each of them. It was delivered to the foreman for approval. If approved, it was then turned over to the payroll department for pay credit. The payroll department would then check the work ticket against the time clock record to see if the time between the employee's punching in and punching out was equal to the time stated on the ticket. Complainant's work ticket

was always approved, and he was paid in full for the time stated thereon.

9. The work clothes used by complainant and the other aforesaid employees consisted of a one-piece garment, referred to in the record as a coverall or uniform, a cap and safety shoes. This coverall was put on by one stepping into it and buttoning it up the front.

10. The nature of the work done by complainant did not require any particular kind of work clothes.

11. During all the time involved in this action, under an agreement between the union of the employees and the defendant, coveralls were furnished for the employees by a laundry. Each employee was to pay for one laundering a week. If more laundering than one was needed, the employer paid for such additional laundering. Defendant furnished to each employee a locker in one of the buildings on the premises in which to keep his work clothing while he was not at work and his street clothing during his working hours, and the company also made available to employees the use of shower baths.

12. The coveralls were delivered from time to time by the laundry to a stockroom in a building located in the dryer house basement, where the employees would exchange soiled ones for clean ones. Complainant did not change his coverall each day. A coverall was exchanged for a clean one when the one in use became soiled. There was no requirement on defendant's part that employees exchange coveralls each day and no requirement that the coveralls be exchanged before the employees reported for work. The employee could exchange a coverall for a clean one during the working hours if the one in use became soiled. How often complainant exchanged his coverall is not shown by the evidence.

13. During the period of complainant's employment, his locker was located at different times in three different buildings, and he reported to his foreman for work at two different places:

First—in the cistern building, from which he reported to work at the machine shop in the dryer house building; his locker was in the cistern building for about two months;

Second—in the dryer house building, from which he reported to work part of the time at the machine shop in the dryer house basement and part of the time at the machine shop in the bottling house;

Third—in the bottling house, from which he reported to work in the machine shop in the dryer house basement a part of the time and part of the time at the machine shop in the bottling house.

14. It would take employee acting with reasonable dispatch, one minute to remove his coat, shirt and trousers and put on a coverall. The only evidence as to the actual time required to do these acts showed it to be one minute. This time did not include opening the locker or putting on safety shoes. It was optional with the employee whether he would wear safety shoes. There is no evidence as to the time it would take to reach in the locker and get a coverall or to put on the safety shoes.

It would take the following time to do the following:

1. To walk from the time clock to the locker in the bottling house, 29 seconds, and to walk from that locker to the place of work assignment in the building, 37 seconds.

2. To walk from the time clock to the locker in the dryer house, 1 minute and 45 seconds, and to walk from that locker to the place of work assignment in that building, namely, the machine shop 58 seconds.

3. To walk from the time clock to the cistern building locker, 1 minute and 20 seconds, and to walk from that locker to the place of work assignment, the machine shop in the dryer house building, 2 minutes and 12 seconds.

The foregoing facts were ascertained by actual determination with the use of a stopwatch:

The time required by actual determination for an employee to go from the time clock to the locker, remove coat, shirt and trousers, put on coverall and walk to place of work was, therefore, with respect to the locations above stated: 2 minutes 6 seconds; 3 minutes 41 seconds; and 4 minutes 32 seconds, respectively.

As above pointed out, the 4 minutes and 32 seconds relate only to a two-month period when complainant's locker was in the cistern building and he reported to work at the machine shop in the dryer house.

The remainder of the period of complainant's employment, with respect to location and the aforementioned activities, is covered by the aforementioned 2 minutes and 6 seconds and 3 minutes and 41 seconds, dependent upon the particular locations involved. The evidence does not show the various times involved in each location, but treating these two elements of time as an average, they involve slightly less than 3 minutes.

15. The compensatory time of complainant was not determined solely by the clock record, but by the daily work ticket made out by each employee, which was checked by defendant's payroll department to see if the time clock record corroborated the time claimed on the work ticket to the extent of showing whether the time shown by the time clock the hours between punching in and punching out, with 30 minutes lunch period deducted, when applicable—was equal to the time shown on the work ticket.

Compensatory time was thus determined on the basis of the scheduled period with statutory allowance for overtime for the 40-hour work week, and the employee's work ticket checked, as above stated, against the time clock record.

16. (a) Complainant was not required by defendant to punch in at the clock before the beginning time of the scheduled period.

(b) Under the clock tolerance of 5 minutes and 59 seconds an employee could actually punch the clock to and including 5 minutes and 59 seconds after beginning time and be recorded by the clock as punching it at beginning time.

(c) An employee would not be docked if he reported to his foreman for work by 10 minutes after beginning time of a scheduled period; he would be on time for his actual productive work if he reported to his foreman by 10 minutes after the beginning time of the scheduled period.

(d) Under the rules and practices of the defendant, if complainant punched the clock at the beginning time of the scheduled period, went to his locker and did the necessary acts aforementioned to prepare himself ready for work, and reported to his foreman by 10 minutes after the beginning time, he would be on time and his compensation would be allowed from the time at which he punched the clock.

(e) Defendant allowed a reasonable time for the employees, after punching the clock, to go to their lockers and do the necessary acts preparatory to presenting themselves to their foreman ready for work.

(f) Said employees were not required by defendant to go to their lockers, obtain and put on their work clothes and shoes and report to their foremen before the beginning of the scheduled period on their own time, but were authorized by the rules and practices of the defendant to do so on compensable time.

17. When complainant punched in at the clock at the beginning time of the scheduled period, he counted the time in making out his work ticket from the beginning time of the scheduled period or in other words, from the time at which he punched in at the clock, when he did so at beginning time. When he punched in early, which he did on other numerous occasions, he counted the time, not from the time he punched in at the clock, but from the beginning time of the scheduled period.

To illustrate: In 43 instances the time credited complainant, as shown on his work ticket, corresponded precisely with the time shown on his time clock record, with deduction for a 30-minute lunch period, where such deduction was applicable. In two or more instances he punched in at the beginning time of the scheduled period and punched out a few minutes early, and he claimed and was allowed 8 hours pay credit. In 11 or more instances he punched in either at or within 5 minutes and 59 seconds before the beginning time of the scheduled period and claimed and was allowed pay credit from the beginning time of the scheduled period. In 10 other instances, he punched in at the beginning time of the period but punched out after the end of the

372

scheduled period (why he did so is not shown), and he counted the time and was given pay credit from the beginning of the scheduled period at which time he punched in at the clock. In 10 instances he failed to punch in but punched out and claimed and was allowed 8 hours in each instance. He also punched in on numerous different occasions 6, 12, 18, 24, 30, 36, and 42 minutes early and in a few instances 48 and 54 minutes early. Why he did so is not shown. On occasion he would punch in at the beginning of the scheduled period or within the clock tolerance of 5 minutes and 59 seconds before or after such beginning time, and then the next day punch in 6, 12, 18 or 24 minutes early.

## Conclusions of Law.

I. The time spent by complainant waiting in line to punch the time clock and exchange his soiled coveralls for clean ones is not compensable time. Cameron v. Bendix Aviation Corporation, D.C., 65 F.Supp. 510; Anderson v. Mt. Clemens Pottery Company, D.C., 69 F.Supp. 710.

II. The 2½ minutes required to walk from the South gate entering defendant's plant to the time clock and the same time spent in walking from the clock to the gate on leaving the plant are not work time or compensable time.

III. The time spent by complainant in getting clean uniforms (when gotten before the beginning of the scheduled working period) and the time spent in changing clothes was spent in an activity solely for the convenience and advantage of the complainant.

IV. The evidence in this case conclusively shows that complainant, proceeding with reasonable dispatch, could, after punching in on the time clock, go to his locker, exchange a soiled for a clean uniform, change his clothing and report to his foreman ready for productive work in from ten to twenty minutes. Such time is within the de minimis rule. Anderson v. Mt. Clemens Pottery Company, 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515; Idem., 69 F.Supp. 710.

Judgment may be submitted dismissing the complaint.